IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| NORTHWEST WHOLESALE, INC., a Washington corporation, | ) ) ) | No. 31491-0-III |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| PAC ORGANIC FRUIT, LLC, a Washington limited liability company, | ) ) ) | PUBLISHED OPINION |
| Defendant. | ) ) ) | |
| HAROLD OSTENSON and SHIRLEY OSTENSON, | ) ) ) ) | |
| Appellants, | ) ) | |
| v. | ) ) | |
| GREG HOLZMAN, INC., a foreign corporation authorized to do business in the State of Washington, GREG HOLZMAN, an individual, and TOTAL ORGANIC, LLC, a Washington limited liability company, | ) ) ) ) ) ) ) ) | |
| Respondents, | ) | |

FEARING, J. —

No. 31491-0-III
*Northwest Wholesale, Inc. v. Pac Organic Fruit*

INTRODUCTION AND RULING

This case revolves around business disputes, between local orchardists Harold and Shirley Ostenson, husband and wife, and San Francisco businessman Greg Holzman, concerning the operation of a Grant County orchard packing facility. Although the Ostensons and Holzman were ostensibly partners, the parties jointly established a limited liability company, Pac Organic Fruit, LLC, (Pac Organic), through which they conducted business with one another. Greg Holzman formed additional companies to shield himself from individual liability and inserted those companies into his business relationships with the Ostensons. Greg Holzman, Inc., (GHI) was the company that became a member of Pac Organic. Both Greg Holzman and the Ostensons blame the other for the deterioration of the packing business. The Ostensons eventually filed a Chapter 11 bankruptcy petition that complicates and controls the outcome of this case. The Ostensons' story presents a primer on how not to conduct business.

Harold and Shirley Ostenson sued Pac Organic, claiming the limited liability company breached a lease for a fruit packing facility, failed to pay for orchard crops, owes them unpaid wages, undercompensated them, owes reimbursement for expenses incurred on behalf of the company, failed to distribute profits, and breached fiduciary duties. Shirley and Harold Ostenson also bring a derivative action, on behalf of Pac Organic against Greg Holzman and his companies, GHI, and Total Organic Fruit, LLC (Total Organic). The derivative action alleges Holzman and his companies mismanaged

2

Pac Organic. This appeal concerns only the derivative action.

The trial court granted Greg Holzman's, GHI's, and Total Organic's (collectively the Holzman defendants) CR 41(b)(3) motion to dismiss, ruling that the Ostensons' bankruptcy dissociated them as members from Pac Organic. According to the trial court, because they were dissociated, RCW 25.15.370 precludes the Ostensons from bringing a derivative action. The Ostensons' nonderivative claims against Pac Organic survive the trial court's ruling, but presumably are worthless because of the financial condition of Pac Organic. The trial court directed a final judgment be entered, under CR 54(b), in favor of the Holzman defendants, because there was no just reason to delay entry of final judgment.

The Ostensons appeal the ruling dismissing the Holzman defendants. They argue their bankruptcy filing did not remove them from membership in Pac Organic and does not disqualify them from asserting a derivative action on behalf of the limited liability company. They also argue that, in the bankruptcy proceeding, the Holzman defendants consented to their membership in Pac Organic and this derivative action. Finally, the Ostensons argue that the Holzman defendants are judicially and collaterally estopped and res judicata bars them from denying the Ostensons' standing to bring the derivative action. We address all of these arguments and more. We affirm the trial court's grant of the Holzman defendants' motion to dismiss, because the Ostensons' bankruptcy filing rendered them ineligible to maintain a derivative action.

3

FACTS

Harold Ostenson and Greg Holzman met in 1997. Holzman owned Greg Holzman, Inc., an organic brokerage business, and desired to expand into Washington State. To this end, the Ostensons and GHI formed, in June 1998, Pac Organic Fruit, LLC, a Washington limited liability company. The Ostensons owned 49 percent of Pac Organic. GHI owned the remaining 51 percent, allowing Greg Holzman, through his corporation, to control business decisions.

The Ostensons' and Holman's operating agreement for Pac Organic designated GHI as the manager of the limited liability company. The manager could be removed by a vote of all members, but remember that GHI was a member. Under the agreement, a member became dissociated upon the occurrence of any event considered a dissociation under the Washington Limited Liability Company Act. The agreement required both the Ostensons and GHI to contribute additional capital at GHI's discretion. Finally the limited liability company agreement obligated Harold Ostenson to lease a packing facility to Pac Organic, obtain a loan towards improving that facility, and pay that loan.

Shirley and Harold Ostenson were more than Pac Organic's minority owners. Harold Ostenson oversaw Pac Organic's operations. Shirley Ostenson served as Pac Organic's accountant. The Ostensons owned the packing facility in Grant County, which they leased to Pac Organic for 20 years with monthly payments beginning at $8,200.

Under Pac Organic's business model, growers delivered fruit to Pac Organic for packing and storage, and Pac Organic paid the growers for their fruit. GHI sold the fruit to distributors, and the distributors paid GHI for the produce. GHI remitted sales proceeds, less its commission, to Pac Organic, rendering Pac Organic financially vulnerable to business practices of GHI. Pac Organic conveyed the fruit to the distributor.

Pac Organic first operated only three months a year. With the goal of operating year-round, Pac Organic added packing lines and constructed four controlled atmosphere rooms. Pac Organic financed this expansion by borrowing almost one million dollars. The Ostensons and Holzman personally guaranteed the loan.

According to the Ostensons, Pac Organic steadily grew from 1998 to 2004. Growers delivering fruit to Pac Organic increased from 3 to over 30. The number of bins packed increased from 491 to 24,539. To accommodate the growth, Pac Organic leased controlled atmosphere rooms from another facility, effective May 1, 2000. Under the terms of the lease, Pac Organic initially leased 4 rooms. Pac Organic promised to increase the number of rooms leased by 2 biannually, such that Pac Organic would eventually lease all 12 of the facility's rooms. At that point, the lease provided Pac Organic the option of purchasing the facility. Total income increased from $187,220 to $3,244,523. Harold Ostenson expected Pac Organic's net profit for 2005 to exceed $324,000.

According to Harold Ostenson, GHI stopped remitting sales proceeds to Pac Organic in 2004, and instead paid growers directly. GHI's records show it owed Pac Organic more and more as 2004 progressed: $310,560 in January, $717,816 in April, and $833,272 in May. Similarly, Pac Organic's records show that GHI remitted less and less: $502,411 in July, $72,494 in August, and nothing in September. The Ostensons accuse GHI of meeting its cash flow needs at the expense of Pac Organic, by paying orchardists directly.

Greg Holzman's version of Pac Organic's decline differs from the Ostensons' testimony. According to Holzman, Pac Organic lost money every year from 1998 to 2003. Holzman maintains that he tried to work with the Ostensons to turn Pac Organic around, but Harold Ostenson was uncooperative. Harold Ostenson, according to Holzman, refused sales of stored fruit because he and buyers disagreed on pricing, which caused fruit to sit past its prime and Pac Organic to lose revenue.

Regardless of who, if anyone, was to blame, Pac Organic financially collapsed. In early January 2005, Pac Organic defaulted on its operating line of credit. The company also defaulted on its lease payments to the Ostensons. On March 8, 2005, Holzman fired the Ostensons from employment with Pac Organic. Later that year, KeyBank foreclosed on the Pac Organic packing facility and the Ostensons' orchard.

On July 27, 2005, Greg Holzman executed, as agent of Pac Organic, a demand promissory note in favor of GHI in the amount of $1,023,009.38. The Ostensons claim

that the note is, at worst, fraudulent, and, at best, constituted mismanagement by Greg

Holzman and GHI of Pac Organic's affairs. Holzman maintains the promissory note Pac

Organic executed in favor of GHI was legitimate and, if anything, understated the amount

Pac Organic owed to GHI. As agent for Pac Organic, Holzman transferred the limited

liability company's assets to GHI to satisfy the note. Holzman assigned Pac Organic's

lease with the cold storage facility to GHI. The Ostensons claim Holzman, through GHI,

wrongfully gutted Pac Organic of any value.

On January 9, 2007, Harold and Shirley Ostenson filed for bankruptcy protection

under Chapter 11. On August 18, 2008, the bankruptcy court approved a "stipulation,"

which attempted to resolve claims of the Ostensons, Holzman, and affiliated entities

against one another. Clerk's Papers (CP) at 2046; Ex. D-5. Under the stipulation, the

Ostensons agreed to arbitrate some claims and litigate others. In relevant portion, that

stipulation reads:

> 5. Mutual Releases. The parties shall incorporate into the
> Ostenson's [sic] plan of reorganization a general and mutual release of all
> claims not expressly addressed or treated herein.
>  . . . .
> 7. This Stipulation does not affect nor release the following claims:
>   a. Any purported claims of the Ostensons against Pac
> Organic, including, but not limited to, claims for unpaid lease installments,
> wages, expense reimbursement, dividends, fruit proceeds, and/or failure to
> pay Keybank's [sic] line of credit, provided that the Ostensons shall not be
> entitled to assert those purported claims, whether derivatively or directly
> (including by way of a veil-piercing or similar theory) against Holzman,
> GHI or POP, such purported claims to be released; and
>   b. Any purported claims of [Pac Organic] (and [Pac Organic]

7

only) against Holzman, GHI, POP and/or Total Organic for their alleged
failure to pay packing fees, expenses, and revenues earned solely by Pac
Organic or fruit proceeds or rent due [Pac Organic] or for conversion of
assets of [Pac Organic].

    c. To avoid multiple suits, any claims described in "b" above
shall be asserted and pled in that litigation presently pending in the Superior
Court of the State of Washington, Chelan County, case number 07-2-
00514-0, captioned <u>Northwest Wholesale, Inc., a Washington corporation,
Plaintiff v. Pac Organic Fruit, LLC, a Washington limited liability
company, Greg Holzman, Inc., a foreign corporation authorized to do
business in the State of Washington; and Harold Ostenson and Shirley
Ostenson, Defendants</u> provided the Superior Court allows the same.

CP at 2045-46.

On October 5, 2010, Greg Holzman filed, in the bankruptcy proceeding, a "Motion
of Creditors Greg Holzman and Purity Organic Holdings, Inc., to Confirm Extent of
Estate Property." CP at 1933. In this motion, Holzman argued for the first time that the
Ostensons were no longer members of Pac Organic because RCW 25.15.130 dissociated
them from the limited liability company when they filed for bankruptcy. In opposition,
the Ostensons wrote:

Holzman and the Holzman entities, in signing the Stipulation, agreed that
these claims, including the stance which Holzman and the Holzman entities
now appear to be advancing, to-wit, that the Ostensons have no right to
bring their derivative claims, is a matter which the parties agreed would be
determined by the Chelan County Superior Court as directed by paragraph
7(c) of the Stipulation[.]

CP at 2320-21. The bankruptcy court did not rule on Greg Holzman's motion.

In October 2009, on the eve of one trial in this pending state case, Pac Organic
Fruit, LLC, also filed a Chapter 11 bankruptcy petition. The bankruptcy court dismissed

8

Pac Organic's petition on the grounds it was filed in bad faith. The bankruptcy judge ordered Pac Organic to pay reasonable attorney fees and costs of two of its creditors, Northwest Wholesale, Inc., and the Ostensons, for time spent in responding to the bankruptcy filing. GHI, on behalf of Pac Organic, appealed the award of attorney fees to the federal district court judge, who affirmed the award but remanded the award for further review of the amount. In his written ruling, the district court judge commented that the Ostensons' "cross-claims against GHI and a derivative claim on behalf of Pac Organic against GHI, Mr. Holzman, and Total Organics LLC" were "[c]onsistent with the stipulation." CP at 1926.

## PROCEEDINGS

Meanwhile, back in Chelan County, Northwest Wholesale, Inc., a creditor of Pac Organic, filed this suit, in May 2007, against Pac Organic, GHI, and the Ostensons, claiming fraudulent conveyances and constructive fraudulent transfers of Pac Organic's assets to GHI. In July 2008, the Ostensons filed cross claims against Pac Organic and GHI, and a third-party complaint against Greg Holzman and Total Organic, Inc. The cross claims against Holzman, GHI, and Total Organic, are in the nature of a derivative action on behalf of Pac Organic.

On January 24, 2011, the trial court dismissed all of Northwest Wholesale's claims against GHI and Pac Organic with prejudice after those parties settled outside of court.

9

The Ostensons' seven claims against Pac Organic and derivative claims against Holzman, GHI, and Total Organic remained.

Trial commenced in Chelan County Superior Court on July 11, 2011. After the Ostensons rested their case on July 13, Greg Holzman, GHI, and Total Organic, moved to dismiss count VIII, the derivative action claim, under CR 41(b)(3). The Holzman defendants argued that the Ostensons were no longer members of Pac Organic and, thus, lacked authority to bring their derivative claim. In response, the Ostensons argued that the Holzman defendants consented, in the bankruptcy stipulation, to the Ostensons' continued membership. The trial court took the motion under advisement, because it needed time to study it. The trial court directed the Holzman defendants to proceed with their evidence in the meantime. For the rest of July 13, 2011 and July 14, these defendants called witnesses, but did not finish their testimony.

The court continued the remainder of trial to February 21, 2012, and then to May 24, 2012. At the Ostensons' request, the court again continued the remainder of trial to November 8, 2012.

In May and June 2012, the Holzman defendants filed a supplemental memoranda in support of their motion to dismiss. On July 13, the Ostensons responded with their own memorandum and a declaration from their attorney, Maris Baltins. Baltins declared Daniel O'Rourke and he represented the Ostensons through bankruptcy. Regarding the bankruptcy stipulation, Maris Baltins declared:

6. In addressing the outstanding disputes between the Ostensons and Holzman and his business entities, on or about April 28, 2008, the parties entered into a Stipulation under which the parties agreed, in pertinent part, as follows:

. . . .

d. The Ostensons would be permitted to assert claims against [Pac Organic], including, but not limited to, claims for unpaid lease installments, wages, expense reimbursement, dividends, fruit proceeds and/or failure to pay a Key Bank line or credit.

e. [Pac Organic] would be permitted to bring claims against Holzman, individually, GHI and/or Total Organic LLC for their alleged failure to pay packing fees, expenses and revenue earned solely by [Pac Organic] or fruit proceeds or rent due.

f. [Pac Organic] would be permitted to bring claims against Holzman, individually, GHI and/or Total Organic LLC for conversion of the assets of [Pac Organic] Fruit, LLC. *See* Aff. O'Rourke, at ¶ 11.

7. With respect to the claims described in paragraphs d, e and f, the parties specifically stipulated that such actions were to be asserted and pled in Chelan County Superior Court, *Northwest Wholesale, Inc. v. Pac Organic Fruit, LLC et al.*, No. 07-2-00514, the instant matter.

CP at 1894-95.

Daniel P. O'Rourke similarly declared:

11. Under the terms of the Stipulation, I believe the parties agree, in pertinent part, as follows:

. . . .

d. The Ostensons would be permitted to assert claims against [Pac Organic], including, but not limited to, claims for unpaid lease installments, wages, expense reimbursement, dividends, fruit proceeds and/or failure to pay a Keybank [sic] line of credit.

e. The Ostensons would be permitted to bring derivative claims by [Pac Organic] against Greg Holzman, individually, [GHI] and/or Total Organic LLC for the alleged failure to pay packing fees, expenses and revenue earned solely by [Pac Organic] or fruit proceeds or rent due.

   f. The Ostensons would be permitted to bring derivative claims by [Pac Organic] against Greg Holzman, individually, [GHI] and/or Total Organic LLC for conversion of the assets of [Pac Organic].

CP at 1907.

In response to the Holzman defendants' renewal of the motion to dismiss, the Ostensons argued that the defendants waived their CR 41 motion by putting on evidence, in their defense, at trial. In turn, the defendants moved to strike Maris Baltins' declaration.

The trial court heard argument on the Holzman defendants' CR 41 motion on September 7, 2012, and granted the motion. On October 3, the court entered written findings of fact and conclusions of law, upon which we cannot improve. In its ruling, the trial court rejected the Ostensons' argument that the defendants waived their right to assert the motion to dismiss by presenting evidence at trial. The court also rejected the Ostensons' contention that the bankruptcy stipulation constituted a consent, under state law, by the Holzman defendants to the Ostensons' continuation as members of Pac Organic. The trial court concluded that, upon filing bankruptcy, the Ostensons relinquished their membership in Pac Organic and thus could not sustain a derivative action on the company's behalf.

The trial court also granted the Holzman defendants' motion to strike attorney Baltins' declaration. The Ostensons do not challenge this ruling on appeal.

On October 15, 2012, the Ostensons moved for reconsideration. For the first time, the Ostensons argued that federal bankruptcy law preempted Washington's statute on the dissociation of LLC members upon filing bankruptcy, and to the same extent preempted Pac Organic's operating agreement. In support of their motion for reconsideration, the Ostensons submitted a declaration from their bankruptcy counsel, Daniel O'Rourke: O'Rourke stated:

> 3. I have received and read a copy of the Opposition to Motion for Reconsideration ("Opposition") filed by Greg Holzman and Greg Holzman, Inc.
> 4. The Opposition contains the statement that the Ostensons "had emphasized to the Bankruptcy Court that all issues pertaining to dissociation were to be litigated by this Court." *See* Opposition, at 6:4-6.
> 5. This statement is untrue. The issue of dissociation was never presented to the Bankruptcy Court by this office.
> 6. The Opposition contains the further statement that "the Ostensons expressly rejected characterization of the Pac O limited liability agreement as an executory contract under Section 365 . . . ." *See* Opposition, at 9:1-3.
> 7. This statement is untrue. The Ostensons in fact never accepted or rejected the Limited Liability Agreement of Pac Organic Fruit, LLC as an executory contract because they were not required to do so by the express terms of the plan.

CP at 2265.

On January 23, 2013, the court denied the Ostensons' motion for reconsideration.

### LAW AND ANALYSIS

*Waiver of Motion to Dismiss*

The Ostensons first contend that the Holzman defendants waived their motion to dismiss, by presenting evidence at trial. They rely principally upon our Supreme Court's

13

No. 31491-0-III
*Northwest Wholesale, Inc. v. Pac Organic Fruit*

holding in *Hector v. Martin*, 51 Wn.2d 707, 321 P.2d 555 (1958). Presumably the Ostensons seek a remand of the case for a further trial for the Holzman defendants to complete their evidence and for the Ostensons to present rebuttal evidence.

CR 41(b)(3), upon which the Holzman defendants based their motion to dismiss, reads, in relevant part:

> (3) *Defendant's Motion After Plaintiff Rests.* After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. . . .

Washington courts have consistently adhered to the rule that a challenge to the sufficiency of the evidence at the close of the plaintiff's case is waived by a defendant who does not stand on his motion and proceeds to present evidence on his own behalf, after his motion to dismiss has been denied. *Hume v. Am. Disposal Co.*, 124 Wn.2d 656, 666, 880 P.2d 988 (1994); *Goodman v. Bethel Sch. Dist., No. 403*, 84 Wn.2d 120, 123, 524 P.2d 918 (1974); *Heinz v. Blagen Timber Co.*, 71 Wn.2d 728, 730, 431 P.2d 173 (1967); *Guyton v. Temple Motors, Inc.*, 58 Wn.2d 828, 365 P.2d 14 (1961); *Hector*, 51 Wn.2d at 709; *LeMaine v. Seals*, 47 Wn.2d 259, 287 P.2d 305 (1955); *System Tank Lines, Inc. v. Dixon*, 47 Wn.2d 147, 286 P.2d 704 (1955); *James v. Ellis*, 44 Wn.2d 599, 269 P.2d 573 (1954); *McDonald v. Wockner*, 44 Wn.2d 261, 267 P.2d 97 (1954); *McCormick v. Gilbertson*, 41 Wn.2d 495, 250 P.2d 546 (1952); *Reninger v. Dep't of Corr.*, 79 Wn.

14

App. 623, 640, 901 P.2d 325 (1995). This rule even applies to criminal cases. *State v. Thomas*, 52 Wn.2d 255, 256, 324 P.2d 821 (1958); *State v. Eide*, 2 Wn. App. 789, 790, 470 P.2d 220 (1970).

Our trial court did not deny the Holzman defendants' motion to dismiss at the close of plaintiffs' case, but instead reserved ruling for a later time. *Hector*, 51 Wn.2d at 707, addresses this situation. There, the court reasoned the same rule should apply when the court *fails to rule* or *reserves* its ruling and the defendant thereafter submits his evidence. *Hector*, 51 Wn.2d at 709. Therefore, the failure of the trial court to rule on a motion to dismiss before introduction of proof by a defendant, is tantamount to a denial of the motion. *Hector*, 51 Wn.2d at 709-10.

All of the Washington reported cases came before the appellate courts in the context of the defendant having lost the motion to dismiss. The question before the reviewing courts was whether the appellate court may entertain evidence presented after the plaintiff rested when determining the merits of the appeal. Such is not the context in which the Ostensons' appeal arrives before us. The Holzman defendants' motion to dismiss was granted. The Ostensons do not contend that further evidence would have changed the trial court's mind. The trial court's ruling, and our ruling as issued later, is based upon undisputed facts concerning the Ostensons' filing of bankruptcy. Waiver should not apply when the trial court reserves a motion to dismiss forwarded at the close of plaintiffs' case, but then grants the motion while defendant is presenting its case.

15

The principal reason behind the waiver rule is to allow both parties, on appeal, the benefit of all evidence in the case, including evidence presented by the defense, when determining if the plaintiff's evidence was sufficient to sustain a claim. *Hector*, 51 Wn.2d at 710; *Petersen v. Dep't of Labor & Indus.*, 40 Wn.2d 635, 641, 245 P.2d 1161 (1952). By putting in a defense, the defendant risks supplying any existing deficiency of evidence in plaintiff's case. *Petersen*, 40 Wn.2d at 641; *Olympia Brewing Co. v. Dep't of Labor & Indus.*, 34 Wn.2d 498, 208 P.2d 1181 (1949), *overruled on other grounds by Windust v. Dep't of Labor & Indus.*, 52 Wn.2d 33, 40, 323 P.2d 241 (1958). When the appellate court decides whether sufficient evidence sustained plaintiffs' claims, the reviewing court may include evidence presented by the defendant, not just evidence presented by the plaintiff before denial of a motion to dismiss. *Reserve Life Ins. Co. v. W. T. Gay*, 101 Ga. App. 96, 112 S.E.2d 786, 788-89 (1960); *Abramson v. W. T. Grant*, 170 A. 815, 12 N.J. Misc. 192 (1934). Here we allow plaintiffs Ostensons the use of any evidence presented by the defense after the trial court reserved her ruling on the motion to dismiss. The motion to dismiss was not as much based upon the insufficiency of the evidence, but based upon a legal point that the Ostensons' bankruptcy filing terminated the Ostensons' standing to maintain a derivative action.

In short, we reject the Ostensons' contention that the trial court could not grant the Holzman defendants' motion to dismiss after defendants began presenting their evidence. Under CR 54(b), any decision of the trial court that did not adjudicate all claims in the

suit is subject to revision. Under this rule, the trial court would hold authority to revise and grant a motion to dismiss earlier denied. Therefore, the trial court should retain authority, during the presentation of defendants' case, to grant a pending motion to dismiss.

### *Derivative Action Standing*

We now address the merits of the motion to dismiss. At issue is whether Harold and Shirley Ostenson have standing to assert a derivative action on behalf of the limited liability company, Pac Organic, against GHI, Greg Holzman, and Total Organic.

To bring a derivative claim on behalf of a limited liability company, the plaintiff must be a member at the time of bringing the action. RCW 25.15.370 reads:

> A member may bring an action in the superior courts in the right of a limited liability company to recover a judgment in its favor if managers or members with authority to do so have refused to bring the action or if an effort to cause those managers or members to bring the action is not likely to succeed.

As the controlling member of Pac Organic, GHI would have authority to determine if a suit should be brought against Greg Holzman, Total Organic, and itself for mismanagement of the limited liability company. We assume that GHI would not approve a suit against itself, its owner, and related company.

RCW 25.15.375 controls our decision and reads:

> In a derivative action, the plaintiff must be a member at the time of bringing the action and:

17

(1) At the time of the transaction of which the plaintiff complains; or

(2) The plaintiff's status as a member had devolved upon him or her by operation of law or pursuant to the terms of a limited liability company agreement from a person who was a member at the time of the transaction.

Under RCW 25.15.130(1)(d)(ii), a member of a limited liability company loses his or her membership upon the filing of bankruptcy. The statute provides:

(1) A person ceases to be a member of a limited liability company, and the person or its successor in interest attains the status of an assignee as set forth in RCW 25.15.250(2), upon the occurrence of one or more of the following events:

. . . .

(d) Unless otherwise provided in the limited liability company agreement, or with the written consent of all other members at the time, the member . . . (ii) files a voluntary petition in bankruptcy . . . .

Under Washington law, the Ostensons thus forfeited a right to bring a derivative action on behalf of Pac Organic when they petitioned for bankruptcy. The limited liability company agreement did not allow continued membership, but conversely ended the bankrupt petitioning as a member in the limited liability company. As an assignee, the dissociated member retains rights to share in profits, but loses any management rights. RCW 25.15.250(2). We now review whether GHI consented in writing to continued membership of the Ostensons in Pac Organic.

*Consent to Continued Membership*

The Ostensons argue that Holzman, as GHI's owner, consented, in the bankruptcy stipulation, to their continued membership in Pac Organic. The Ostensons thus assign

18

error to the trial court's conclusion that the stipulation does not constitute a written

consent for purposes of RCW 25.15.130(1)(d). To resolve the issue, we must interpret

that stipulation.

Normal contract principles apply to the interpretation of stipulations. *In re*

*Marriage of Pascale*, 173 Wn. App. 836, 841, 295 P.3d 805 (2013) (interpreting a CR 2A

agreement). The stipulation at issue here served as a "general and mutual release of all

claims not expressly addressed or treated herein." CP at 2045. But, as quoted above,

paragraph 7 of the stipulation excluded from that release:

> a. Any purported claims of the Ostensons against [Pac Organic],
> including, but not limited to, claims for unpaid lease installments, wages,
> expense reimbursement, dividends, fruit proceeds, and/or failure to pay
> Keybank's [sic] line of credit, provided that the Ostensons shall not be
> entitled to assert those purported claims, whether derivatively or directly
> (including by way of a veil-piercing or similar theory) against Holzman,
> GHI or POP, such purported claims to be released; and
> b. Any purported claims of [Pac Organic] (and [Pac Organic] only)
> against Holzman, GHI, POP and/or Total Organic for their alleged failure
> to pay packing fees, expenses, and revenues earned solely by [Pac Organic]
> or fruit proceeds or rent due [Pac Organic] or for conversion of assets of
> [Pac Organic].

CP at 2046.

Paragraph 7(b) reserves claims of Pac Organic against the Holzman defendants.

But the paragraph does not address whether the Ostensons can assert those claims.

Although unlikely, Pac Organic itself could assert the claims.

19

We agree with the trial court that the bankruptcy stipulation does not address the Ostensons' continuation as members of Pac Organic. Long before the stipulation, the Ostensons' membership had been ended, because their rights ended with the bankruptcy filing, not the stipulation. The Ostensons' resurrection of membership in the limited liability company and the Ostensons' ability to file a derivative action on behalf of Pac Organic is contrary to the tenor of the stipulation and the law. If the Ostensons intended to reserve such rights, such language should have been expressly inserted in the stipulation.

The Ostensons' bankruptcy attorney, by affidavit, testified he "believe[d]" that the parties agreed in the bankruptcy stipulation that the Ostensons may bring derivative claims on behalf of Pac Organic against Greg Holzman, GHI, and Total Organic for debts owed and conversion of assets. CP at 1907. This testimony is worthless since testimony based upon "belief" is inadmissible. *Am. Linen Supply Co. v. Nursing Home Bldg. Corp.*, 15 Wn. App. 757, 765, 551 P.2d 1038 (1976). The attorney provides no testimony concerning negotiations leading to the stipulation nor concerning any discussions with the Holzman defendants to the effect that the Ostensons reserved the right to bring derivative actions or that they sought continued membership in the limited liability company.

The Ostensons emphasize that the bankruptcy court judge, in a bankruptcy petition filed by Pac Organic, indicated that the Ostensons cross claims against GHI and a

derivative claim on behalf of [Pac Organic] against GHI, Mr. Holzman, and Total

Organics LLC were "[c]onsistent with the stipulation." CP at 1926. Nevertheless, the

bankruptcy judge, when rendering the comments, addressed whether attorneys' fees

should be granted parties for a bad faith filing of bankruptcy. The court did not directly

address whether the Ostensons had standing to bring a derivative action or if the Holzman

defendants consented to the Ostensons continued membership in the limited liability

company, Pac Organic.

Since the Holzman defendants did not consent in writing to the Ostensons'

continued membership in Pac Organic through the stipulation or otherwise, the Ostensons

lack statutory authority and standing, under Washington law, to bring their derivative

claim.

### *Motion for Reconsideration*

Shirley and Harold Ostenson argued for the first time, in a motion for

reconsideration, that federal bankruptcy law preempts Washington's dissociation statutes

for LLCs and the bankruptcy law requires that they remain members with management

rights in Pac Organic. The Ostensons forward this argument again on appeal. Before

addressing the merits of the argument, we must decide whether the Ostensons could raise

the contention for the first time on a motion for reconsideration.

"By bringing a motion for reconsideration under CR 59, a party may preserve an

issue for appeal that is closely related to a position previously asserted and does not

depend upon new facts." *River House Dev. Inc. v. Integrus Architecture, P.S.*, 167 Wn. App. 221, 231, 272 P.3d 289 (2012). The law provides no guidelines for determining whether a new position is "closely related" to a previous position. We give the Ostensons the benefit of the doubt, for several reasons. Their bankruptcy law argument reasserts the underlying argument that they remained members of the limited liability company. We find no prejudice to the Holzman defendants by the late assertion of the new contention. The argument does not rely on any new facts. The trial court was free to review the bankruptcy law argument and we will review the argument on appeal.

### *Bankruptcy Law*

This court reviews a trial court's denial of a motion for reconsideration for abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. *River House*, 167 Wn. App. at 231. Deferring to the trial court's discretion here, however, benefits the Holzman defendants none since the bankruptcy law argument raises a pure question of law, with no weighing of facts. A ruling based on an erroneous legal interpretation is necessarily an abuse of discretion. *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 339, 858 P.2d 1054(1993).

Harold and Shirley Ostenson argue that either 11 U.S.C. § 541(c)(1) or 11 U.S.C. § 365 preempts RCW 25.15.130 from dissociating them as members of the limited liability company, Pac Organic. In resolving this question we stumble into an esoteric

22

discussion of partnership law, limited liability company law, the nature of dissociation of a member or partner, economic and noneconomic interests in partnerships and LLCs, and executory contracts. We bounce to and from federal and state law. A key to answering the issue is distinguishing between economic and noneconomic interests in shares of a limited liability company. An economic interest is limited to sharing in any profits of the company. A noneconomic interest is voting on and managing company affairs.

Washington limited liability company statutes address the implication of a company member's filing of bankruptcy. RCW 25.15.130(d) declares that the member is dissociated from the company. The statute reads, in relevant part:

> (1) A person ceases to be a member of a limited liability company, and the person or its successor in interest attains the status of an assignee as set forth in RCW 25.15.250(2), upon the occurrence of one or more of the following events:
> . . . .
> (d) Unless otherwise provided in the limited liability company agreement, or with the written consent of all other members at the time, the member . . . (ii) files a voluntary petition in bankruptcy; (iii) becomes the subject of an order for relief in bankruptcy proceedings.

The dissociation of one member, however, does not terminate the limited liability company. RCW 25.15.270 lists the events that spawn a dissolution and all members must be dissociated before a dissolution. The dissociated member, having assumed the shoes of an assignee of an ownership interest, has no rights of management in the company. RCW 25.15.250 declares:

23

(1) A limited liability company interest is assignable in whole or in part except as provided in a limited liability company agreement. The assignee of a member's limited liability company interest shall have no right to participate in the management of the business and affairs of a limited liability company except:

(a) Upon the approval of all of the members of the limited liability company other than the member assigning his or her limited liability company interest; or

(b) As provided in a limited liability company agreement.

We now turn to federal bankruptcy law. Section 541(c)(1) provides:

Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—
(A) that restricts or conditions transfer of such interest by the debtor; or
(B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

The Ostensons maintain that their interest in Pac Organic became part of their bankruptcy estate. This contention is correct, but does not end our inquiry. This appeal does not ask us to address whether the Ostensons retained some ownership interest in the assets of Pac Organic. We are asked to determine if the Ostensons retained management rights and the right to file a derivative action.

Under 11 U.S.C. § 541, the commencement of a bankruptcy case creates an estate comprising all legal or equitable interests of the debtor in property, including any interest in a limited liability company. *In re Daugherty Constr., Inc.*, 188 B.R. 607, 611 (Bankr.

24

D. Neb. 1995). Modifying this rule, however, is the rule that, while § 541(a) provides whether an interest of the debtor is property of the estate, a debtor's property rights are defined at state law. *Butner v. United States,* 440 U.S. 48, 55, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979); *In re Pettit,* 217 F.3d 1072, 1078 (9th Cir. 2000). Therefore, Washington law still defines what property rights the Ostensons held upon filing bankruptcy.

The Ostensons rely on *In re Daugherty Constr., Inc.,* 188 B.R. 607 (Bankr. D. Neb. 1995), to support their contention that they retained membership and management rights in Pac Organic. There the Chapter 11 debtor, Daugherty Construction, Inc., was a member of a number of Nebraska limited liability companies formed to develop apartment complexes in Lincoln. The *Daugherty* court found that, under the Nebraska Limited Liability Companies Act, bankruptcy of a member in an LLC causes the membership to terminate, and that, if the remaining members vote to continue the business of the LLC, the bankruptcy debtor is not a member of the LLC. Such termination, under state law, included Daugherty's *noneconomic and economic interests* in the LLCs. The *Daugherty* court concluded that federal law trumped the state law, such that the debtor's management rights were not terminated. The court ruled: "the debtor's interest in the LLCs constitutes property of the bankruptcy estate and state law purporting to terminate that interest is unenforceable under section 541(c)." 188 B.R. at 611.

*Daugherty* is persuasive authority whose reasoning does not apply to Washington law. Unlike the Nebraska limited liability company law at issue in *Daugherty,*

Washington law does not operate to deny the debtor's bankruptcy estate both the debtor's economic and noneconomic interests in LLCs. Instead, RCW 25.15.130 dissociates a member. If, as is the case here, there are remaining members, such dissociation does not result in a dissolution. RCW 25.15.270. The dissociated member retains his or her economic rights. RCW 25.15.250.

Chapter 25.15 RCW is similar to the Virginia limited liability company statutes at issue in *In re Garrison-Ashburn, L.C.*, 253 B.R. 700 (Bankr. E.D. Va. 2000). In *Garrison-Ashburn*, the court addressed a similar issue: whether the dissociation of a member upon filing a petition in bankruptcy is effective in light of Sections 365(c), 365(e) and 541(c) of the Bankruptcy Code? Like Washington, Virginia law dissociated a member of a limited liability company upon their becoming a debtor in bankruptcy. Va. Code § 13.1-1040.1(6)(a). Since a dissociated member is no longer a member of the company, he does not have any management rights under § 13.1-1022 and may not bind the company under § 13.1-1021.1. While he retains his membership interest, he stands in the same relationship to the company as an assignee of his membership interest. The *Garrison-Ashburn* court reasoned that all the rights and privileges the debtor possessed prior to filing, including his economic and noneconomic interest in an LLC, became property of the bankruptcy estate. But, unless otherwise provided in the Bankruptcy Code, the rights and benefits were burdened with all of the duties and obligations that came with them. Thus, instead of dissociating the debtor, Virginia law operated to

26

dissociate the bankruptcy estate itself. The court concluded, "Consequently, unless precluded by § 365(c) or (e), his bankruptcy estate has only the rights of an assignee." *Garrison-Ashburn*, 253 B.R. at 708.

Given the similarities between Virginia's and Washington's treatment of LLC members who file for bankruptcy, we adopt the reasoning of *Garrison-Ashburn*. By applying Washington law, we conclude that RCW 25.15.130 dissociates a bankruptcy estate such that it retained the rights of an assignee under RCW 25.15.250(2), but not membership or management rights, despite the provisions of 11 U.S.C. § 541(c)(1).

We now address whether another section of the bankruptcy code, 11 U.S.C. § 365 operates to the favor of the Ostensons. Under § 365(a), "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." Section 365(c) provides:

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
> (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
> (B) such party does not consent to such assumption or assignment.

In turn, Section 365(e) reads:

> (1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under

27

such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; or

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

(2) Paragraph (1) of this subsection does not apply to an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(A)(i) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(ii) such party does not consent to such assumption or assignment.

Section 365(c)(1) and (e)(2)(A) were designed to protect nondebtor third parties whose rights may be prejudiced by having a contract performed by an entity other than the one with which they originally contracted. *In re First Protection, Inc.*, 440 B.R. 821, 832 (B.A.P. 9th Cir. 2010); *C.O.P Coal Dev. Co. v. C.W. Mining Co.*, 422 B.R. 746, 761 (B.A.P. 10th Cir. 2010).

We must decide whether the Pac Organic limited liability company agreement is an executory contract, and, if so, whether applicable law excuses GHI, the other signatory to the operating agreement, from continuing to accept performance of the Ostensons under the agreement. Although the Bankruptcy Code does not define "executory contract," courts define such a contract as one on which performance is due to some extent on both sides. *In re Wegner*, 839 F.2d 533, 536 (9th Cir. 1988). The Ninth Circuit

has adopted the "Countryman Test," under which a contract is executory if the obligations of both parties are so far unperformed that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other. *Unsecured Creditors' Comm. v. Southmark Corp.*, 139 F.3d 702, 705 (9th Cir. 1998); *Griffel v. Murphy,* 839 F.2d 533, 536 (9th Cir. 1988); Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 MINN. L. REV. 439, 460 (1973). Factors relevant in evaluating whether a limited liability company operating agreement remains executory include whether the agreement imposes remote or hypothetical duties, requires ongoing capital contributions, and the level of managerial responsibility imposed on the debtor. *In Re Warner*, 480 B.R. 641, 651 (Bankr. N.D.W. Va. 2012). If there are no material obligations that must be performed by the members of a limited liability company or the limited partners in a limited partnership, then the contract is not executory and is not governed by Code § 365. *In Re Ehmann*, 319 B.R. 200, 205 (Bkrtcy. D. Ariz. 2005).

The Ostensons again rely on *Daugherty*, which observed that under the debtor's limited liability company agreements, all members maintained a continuing obligation to participate in the management of the LLCs and to contribute capital in the event of a fiscal net loss. On these facts, the court held that the limited liability company operating agreements were executory in nature.

The Ostensons characterize the Pac Organic LLC operating agreement as an

executory contract because of several provisions. The agreement requires both the Ostensons and Holzman to contribute additional capital at GHI's discretion. Harold Ostenson is obligated to lease a packing facility to Pac Organic, obtain a loan towards improving that facility, and pay that loan. GHI is to manage Pac Organic. These provisions may suffice to create an executory contract. *See, e.g., In re Allentown Ambassadors, Inc.*, 361 B.R. 422, 444 (Bankr. E.D. Pa. 2007). In the end, however, we need not decide if the operating agreement is an executory contract, because we otherwise hold that § 365(e) of the bankruptcy code excuses further performance under the agreement.

If the Pac Organic LLC agreement is an executory contract for purposes of § 365, the "final step in the analysis" is to evaluate the applicability of § 365(e)(2), which exempts certain executory contracts from continued performance. *In Re Tsiaoushis*, 383 B.R. 616, 620 (Bankr. E.D. Va. 2007). Limited liability companies are relatively new statutory creations and little law addresses the question of whether a limited liability company's operating agreement is an executory contract to be further performed upon a member's filing of bankruptcy. *Tsiaoushis*, 383 B.R. at 618. "Because of the similarities between LLCs and partnerships in this area of inquiry, the cases involving partnerships also provide guidance regarding the appropriate consequences of the bankruptcy of a member or member-manager of a LLC." Sally S. Neely, *Partnerships and Partners and Limited Liability Companies and Members in Bankruptcy: Proposals for Reform*, 71 AM.

BANKR. L.J. 271, 317 (1997). Thus, we turn to a Washington decision concerning partnerships, *Finkelstein v. Sec. Properties, Inc.*, 76 Wn. App. 733, 888 P.2d 161 (1995), to decide the applicability of § 356(e)(2).

In *Finkelstein v. Security Properties, Inc.*, this court affirmed a trial court order dismissing most of Stephen Finkelstein's claims against Security Properties. The court held that, under state partnership law, which is not superseded by federal bankruptcy law, a limited partnership dissolves upon the Chapter 7 bankruptcy filing of one of the partners. Finkelstein therefore lacked standing to bring a derivative action on behalf of the limited partners. Finkelstein became a minority partner in two general partnerships. The partnerships each served as general partner for several limited partnerships. Each general partnership agreement provided that the partnership would not dissolve or terminate upon the death, incapacity, or bankruptcy of any partner. Finkelstein filed bankruptcy. Each general partnership then amended its partnership agreement to exclude Finkelstein as a partner. Finkelstein continued to receive correspondence and tax forms from Security Properties which referred to him as a partner in the two general partnerships. Finkelstein filed suit against Security Properties and the general partnerships for an accounting, breach of fiduciary duties, and a derivative action on behalf of several limited partnerships.

On appeal, the *Finkelstein* court addressed whether U.S.C. § 365 saved Finkelstein's membership in the partnerships. The court observed that partnership

31

agreements are, at least in part, executory contracts, for purposes of the Bankruptcy Code. Nevertheless, under § 365, the other partners are not obligated to accept an assumption of the partnership agreement. Partnerships are voluntary associations, and partners are not obligated to accept a substitution for their choice of partner. The restraint on assumability also makes the deemed rejection provision of § 365 inapplicable to the partnership agreement. Therefore, § 365(e)'s invalidation of ipso facto provisions does not apply, and state partnership law is not superseded. The debtor-partner's economic interest is protected by other sections of the bankruptcy code, but he no longer is entitled to membership.

Stephen Finkelstein's Chapter 11 bankruptcy petition was later converted to a Chapter 7. During bankruptcy protection, Shirley and Harold Ostenson remained under a Chapter 11 plan. We conclude, however, that the same reasoning applies to a Chapter 11 filing. The provisions of § 365 are applied to both Chapter 7 and Chapter 11 filings.

We conclude that 11 U.S.C. § 541 and § 365 did not preempt Washington law that removed the Ostensons as members in the limited liability company, Pac Organic, upon their filing bankruptcy. The trial correctly denied the Ostensons' motion for reconsideration.

### *Judicial Estoppel*

The Ostensons contend that the trial court erred by not estopping the Holzman defendants from denying the Ostensons' authority to bring their derivative action. The

Ostensons raise the related, but distinct, doctrines of judicial estoppel, collateral estoppel, and res judicata. We will address those doctrines in such order.

Judicial estoppel is an equitable doctrine that precludes a party from asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position. *Arkison v. Ethan Allen, Inc.*, 160 Wn.2d 535, 538, 160 P.3d 13 (2007); *Bartley-Williams v. Kendall*, 134 Wn. App. 95, 98, 138 P.3d 1103 (2006). The doctrine seeks to preserve respect for judicial proceedings and to avoid inconsistency, duplicity, and waste of time. *Cunningham v. Reliable Concrete Pumping, Inc.*, 126 Wn App. 222, 225, 108 P.3d 147 (2005); *Johnson v. Si-Cor, Inc.*, 107 Wn. App. 902, 906, 28 P.3d 832 (2001). We review a trial court's decision to apply the equitable doctrine of judicial estoppel for abuse of discretion. *Arkison*, 160 Wn.2d at 538.

Three core factors guide a trial court's determination of whether to apply the judicial estoppel doctrine: (1) whether a party's later position is clearly inconsistent with its earlier position, (2) whether judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled, and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *N.H. v. Me.*, 532 U.S. 742, 750-51, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001); *Arkison*, 160 Wn.2d at 538-39. These factors are not an exhaustive formula and additional considerations may guide a court's decision. *Arkison*, 160 Wn.2d at 539.

The Ostensons claim that the Holzman defendants consented, in the bankruptcy stipulation, to the Ostensons bringing their derivative claim in Chelan County Superior Court and they now, inconsistently, claim the Ostensons lack authority to bring those claims. But, as discussed above, the Holzman defendants reserved the right of Pac Organic bringing claims, not the Ostensons filing a derivative action. Also, the Holzman defendants, in paragraph 7 of the stipulation, consented to a particular forum for resolving the Pac Organic claims, not any particular outcome. The Holzman defendants' position in this suit is not "clearly inconsistent" with the bankruptcy stipulation. The trial court did not abuse its discretion in refusing to apply the doctrine of judicial estoppel.

### Collateral Estoppel

Collateral estoppel means that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. *State v. Williams*, 132 Wn.2d 248, 253-54, 937 P.2d 1052 (1997); *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S. Ct. 1189, 1195, 25 L. Ed. 2d 469 (1970). Collateral estoppel has four requirements: (1) the issue decided in the prior adjudication must be identical with the one presented in the second, (2) the prior adjudication must have ended in a final judgment on the merits, (3) the party against whom the plea of collateral estoppel is asserted must have been a party or in privity with a party to the prior litigation, and (4) application of the doctrine must not work an injustice. *Williams*, 132 Wn.2d at 254. The party asserting collateral estoppel bears the

burden of proving all four requirements. *Williams*, 132 Wn.2d at 254. Additionally, the issue to be precluded must have been actually litigated and necessarily determined in the prior action. *Shoemaker v. City of Bremerton*, 109 Wn.2d 504, 508, 745 P.2d 858 (1987); *Seattle-First Nat'l Bank v. Kawachi*, 91 Wn.2d 223, 228, 588 P.2d 725 (1978). The question is always whether the party to be estopped had a full and fair opportunity to litigate the issue. *State Farm Mut. Auto. Ins. Co. v. Avery*, 114 Wn. App. 299, 304, 57 P.3d 300 (2002).

The Ostensons argue the bankruptcy court ruled that they had the right to pursue their derivative claim. But the bankruptcy stipulation approved a particular forum for Pac Organic to pursue claims. The bankruptcy court never adjudicated whether the Ostensons had standing to pursue a derivative action.

## Res Judicata

"Res judicata, or claim preclusion, prohibits the relitigation of claims and issues that were litigated, or could have been litigated, in a prior action." *Pederson v. Potter*, 103 Wn. App. 62, 67, 11 P.3d 833 (2000); *Loveridge v. Fred Meyer, Inc.*, 125 Wn.2d 759, 763, 887 P.2d 898 (1995). The doctrine is designed to prevent relitigation of already determined causes and curtail multiplicity of actions and harassment in the courts. *Bordeaux v. Ingersoll Rand Co.*, 71 Wn.2d 392, 395, 429 P.2d 207 (1967). For the doctrine to apply, a prior judgment must have a concurrence of identity with a subsequent action in (1) subject matter, (2) cause of action, *and* (3) persons and parties, and (4) the

35

quality of the persons for or against whom the claim is made. *See Rains v. State*, 100 Wn.2d 660, 663, 674 P.2d 165 (1983).

The Ostensons and Holzman did not litigate the issue of whether RCW 25.15.130 dissociated the Ostensons from Pac Organic in bankruptcy court. The subject matter and causes of action in the bankruptcy court were not the same.

### *Attorney Fees*

The Ostensons requests attorney fees and costs pursuant to RAP 18.1. "The court rule requires more than a bald request for attorney expenses on appeal. The party seeking costs and attorney fees must provide argument and citation to authority to establish that such expenses are warranted." *Henne v. City of Yakima*, 177 Wn. App. 583, 590, 313 P.3d 1188 (2013) (citations omitted). The Ostensons ask for fees "allowed by law," but cite no authority. We deny the Ostensons an award of fees on appeal, particularly since they are the losing party on appeal.

### CONCLUSION

We affirm the trial court's dismissal of Harold and Shirley Ostenson's derivative action brought on behalf of Pac Organic Fruit, LLC, against Greg Holzman, Greg

No. 31491-0-III
*Northwest Wholesale, Inc. v. Pac Organic Fruit*

Holzman, Inc., and Total Organic.

_____
Fearing, J.

WE CONCUR:

_____
Brown, J.

_____
Siddoway, C.J.